# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 29, 2012 Session

## STATE OF TENNESSEE v. MICHAEL DAVID FIELDS

**Appeal from the Criminal Court for Sullivan County**
**No. S52,296    Robert H. Montgomery, Jr., Judge**

———————————

**No.  E2010-02446-CCA-R3-CD - Filed April 30, 2013**

———————————

Appellant, Michael Fields, was indicted by the Sullivan County Grand Jury for two counts of first degree murder, two counts of first degree felony murder, and two counts of especially aggravated robbery.  After a jury trial, he was convicted as charged.  The jury determined that the sentence for the first degree murder counts should be life without parole.  The trial court merged the first degree murder convictions into the first degree felony murder convictions. The trial court imposed a twenty-five-year sentence for each especially aggravated robbery conviction.  The twenty-five-year sentences were ordered to run concurrently to the life sentences.  The two life sentences were ordered to run consecutively to each other and consecutively to a previously imposed sentence of life plus forty years.  Appellant presents several arguments on appeal: (1) the trial court erred in denying his motion to change venue; (2) the trial court erred in denying his request for the trial judge to recuse himself; (3) the trial court erred in denying his motion for a mistrial when there was juror contact with the prosecuting officer; (4) there was prosecutorial misconduct during closing argument; (5) the trial court erred in denying his motion to suppress his statement to police; (6) the trial court erred in excluding the testimony of Appellant's proffered expert witness, Dr. Charlton Stanley; (7) the trial court erred in allowing the use of a stun belt on Appellant during the trial; (8) the trial court erred in denying his motion for judgment of acquittal; (9) the evidence was insufficient to support his convictions; and (10) the trial court erred in imposing the sentence for especially aggravated robbery and in ordering consecutive sentences. Appellant argues several smaller miscellaneous issues concerning evidentiary rulings, closing argument of the State, the denial of his request to have both of his attorneys present separate closing arguments, the denial of funds to pay an expert witness, and the failure to assure that Appellant received his prescribed medication in jail.  After a thorough review of the record, we find no error.  Therefore, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are
Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROGER A. PAGE, JJ., joined.

Timothy R. Wilkerson (on appeal); Wayne Culbertson (at trial); and Matthew King (at trial) Kingsport, Tennessee, for the appellant, Michael David Fields.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Greeley Wells, District Attorney General; and Barry P. Staubus, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Factual Background*

On May 17, 2006, Officer Sean Chambers with the Kingsport Police Department was on duty. He received a call at 7:45 p.m. to proceed to 1621 Arbor Place, Apartment 4 because of reported drug activity. Glen Thacker and Asiah Walton, the victims in the case at hand, were sitting in a car parked in the parking lot of the apartment complex. Officer Chambers noticed a pair of brass knuckles on the floor board of the car, and Mr. Thacker admitted that they were his. Officer Chambers arrested Mr. Thacker for possession of a prohibited weapon and asked for consent to search the apartment where Mr. Thacker and Ms. Walton lived. They consented. During the search, he discovered Methadone and Suboxin pills in Ms. Walton's purse and arrested her for possession of scheduled drugs. While in the apartment, Officer Chambers noticed a black and gold Easton baseball bat behind the front door. Mr. Thacker told Officer Chambers that he kept the baseball bat for protection because he sold cocaine. Officer Chambers did not collect the baseball bat or take it from the apartment.

Lori Duncan knew Mr. Thacker and Ms. Walton because she purchased drugs from them on a regular basis. She traded pills and cash for cocaine for herself and others. She did this five or six times a day throughout the year leading up to the victims' deaths. When she dealt with them, she would call ahead to order the drugs and go to their apartment to pick them up. When she would arrive at the apartment, the door would be locked. She testified that she never saw Mr. Thacker or Ms. Walton with a gun. She also had never heard them talk about owning a gun. Ms. Duncan had also seen the baseball bat described by Officer Chambers while in Mr. Thacker's apartment. She said she saw him exercising with it.

In May 2006, Appellant lived with his mother, Rosa Burke. She testified that Appellant was bipolar and drew a social security disability check. He also worked off and on for a company out of Elizabethton, and he often traveled to Wyoming, as well as other

places. She knew that he had been prescribed Xanax, Lortab, and Valium. Ms. Burke testified that Appellant abused his prescription drugs. He had also told her that he bought and used cocaine. Appellant sold and traded pills for cocaine and crack. In May 2006, Appellant bought an old GMC truck from Ms. Burke, but he sold it around the beginning of June 2006.

Appellant told Ms. Burke that he had had an argument with "Glen" during a telephone conversation and that he had hung up on Glen. He told her that Glen was a drug dealer who lived in Lynn Garden. On a separate occasion, Appellant told Ms. Burke that no one had seen Glen in a couple of days. On Wednesday, May 31, 2006, Ms. Burke walked by Appellant and noticed that he was lying on his back staring at the ceiling. She asked him what he was thinking about, and he replied, "You don't want to know." Later that evening, Appellant told Ms. Burke that he was moving out and that was the last night he stayed in her house. He left at 11:20 p.m. Shortly thereafter, Appellant sold the GMC truck. On Saturday, Appellant came to visit Ms. Burke and asked her if she loved him unconditionally. She replied that she did.

Henry Fields testified that his brother, Appellant, came to stay with him around the beginning of June 2006. He was living with his girlfriend, Sandra Fugate, at the time. On June 2, 2006, Appellant arrived at Henry's house at 2:30 a.m. He awakened Henry and Ms. Fugate. Appellant told them he had two bags of cocaine and some pills. The three of them used the drugs.

Around 4:00 a.m., Appellant told Henry that he wanted to go to Yuma, Virginia, to see their father. Henry testified that they drove the back way through Carter's Valley. This was not their normal route taken to see their father. They instead drove along the river. Henry asked Appellant why they were taking a different route and, Appellant replied that he "needed to get rid of some evidence." Appellant made some comments about not knowing whether Glen would live or die and that Glen had gotten what he deserved. Henry had heard Appellant mention Mr. Thacker on multiple occasions. He knew that Mr. Thacker was Appellant's source for cocaine.

They stopped next to the river. Appellant got out of the truck and retrieved something from under the hood of his truck. He told Henry to remain in the truck. Henry heard water splashing and leaves crinkling. Henry could not see what Appellant took out of the truck because it was dark. Appellant got back in the truck and asked Henry if he would like to have the pair of boots that was sitting on the seat between them. Henry said he did not want the boots, so Appellant told Henry to throw the boots out of the window as they were driving. Appellant was wearing a t-shirt and blue jeans that night.

Eventually, they arrived at their father's house. However, Appellant did not stop and instead drove to their cousin's house, but the cousin was not home. On the way back to Henry's house, they passed Arbor Lane, and Appellant stated that everything looked okay. They returned to Henry's house and continued to use drugs. Ms. Fugate testified that the brothers had been gone about an hour and a half. Appellant sold the GMC truck soon afterwards.

Henry stated that he did not know Mr. Thacker or Ms. Walton. He denied that he or Ms. Fugate had killed the victims. He denied that he requested that Appellant take the blame. Henry stated that when he and Appellant were riding in the truck, he thought that Appellant was high and blowing off steam. However, when he started thinking about Appellant's statements, he decided to go to the police.

On June 6, 2006, Detective Cole, with the Kingsport Police Department, spoke with Ms. Burke and Henry. Their conversation lasted approximately thirty minutes. Because of information given to him during the conversation, Detective Cole and Corporal Frank Wright proceeded to 1621 Arbor Place to check on occupants of an apartment in the complex at that address. When they arrived, they knocked on the door of the apartment, but they received no answer. They spoke with a few neighbors. As they were standing near the apartment, the officers noticed a great deal of fly activity on a front window. They checked with their supervisor, and broke into the apartment. They found Mr. Thacker lying on the floor next to the couch and found Ms. Walton's body lying in the hallway. As they searched the apartment they saw blood spatter. They did not find any weapons.

When arrested in Kingsport by other officers, Appellant was in possession of a brown leather glove and a stainless steel paring knife. Detective Cole and Agent Frank McCauley with the Tennessee Bureau of Investigation ("TBI") went to the Justice Center in order to interview Appellant. Agent McCauley went over Appellant's Miranda rights with him. Agent McCauley asked Appellant if he understood his rights, and Appellant replied that he did. However, Appellant refused to sign the waiver form. Initially, Appellant told the officers that he took his brother, Henry, to the victims' apartment, and Henry had committed the murders. He said that Henry had "cut them up." After Appellant spoke with his mother, at his request, he returned and admitted that he had committed the murders. The officers wrote out a statement based upon what Appellant said. However, Appellant again refused to sign the statement, as well as, initial corrections to the statement. The statement was witnessed by Agent McCauley and Detective Jason Bellamy.

Detective Cole and other officers searched the area around the Holston River in Yuma, Virginia. Sergeant Joe Earls and Detective Cole each found a left and right, respectively, brown GBX boot, size 11 in the area searched. In addition, the officers found

shorts, a washcloth, and a shirt. The victim's baseball bat was discovered in the river by a fisherman and was given to police on June 11, 2006.

Dr. Teresa Campbell performed the autopsies on the victims. She concluded that the cause of death for both victims was blunt force trauma to the head. She testified that Mr. Thacker sustained injuries including multiple skull fractures, laceration to the head and right ear, bleeding around the brain, other body abrasions, contusions to the right side and upper back, a kidney contusion, and some aspiration of gastric contents in his airways. Mr. Thacker had been struck in the head at least three times. Ms. Walton's injuries included multiple head and neck lacerations, skull fractures, contusions to the right chest wall, the right thigh, back of the right arm and the right lung, and she had abrasions to her left index finger and her right knee. Dr. Campbell concluded that the injuries sustained by the victim were consistent with being struck by a blunt object, such as a baseball bat.

Appellant's brother brought officers Appellant's belongings that had been left in his house. The belongings included a duffle bag containing bottles of prescription drugs. The medications given to the police by Appellant's brother included a bottle of Hydrocholorzide, a bottle that contained 7 small orange pills, and 10 various empty prescription bottles.

The TBI tested all items recovered but was unable to recover any DNA evidence from the items.

Two of Appellant's brothers, Greg Fields and Scott Fields, testified on Appellant's behalf. Both brothers stated that through discussions with their mother they became aware that Henry had actually committed the murders. Greg stated that he also had a discussion with Henry wherein Henry told him that he had committed the murders and Appellant was dumb enough to take the blame for it.

Both Henry and Ms. Burke took the stand in rebuttal for the State. They both denied the testimony of Greg and Scott.

At the conclusion of the jury trial, the jury found Appellant guilty of two counts of first degree murder, two counts of felony murder, and two counts of especially aggravated robbery. The trial court sentenced Appellant to twenty-five years for each count of especially aggravated robbery, and the jury determined that Appellant should receive a sentence of life without parole for each count of first degree murder. The trial court merged the counts for first degree murder into the counts for felony murder. The trial court ordered the twenty-five -year sentences to run concurrently with the life sentences for felony murder and the sentences for felony murder to run consecutively to each other. In addition, the trial court

ordered that the felony murder life sentences be served consecutively to a previously imposed life sentence plus forty years.

## ANALYSIS

### Denial for Motion of a Change of Venue

Appellant argues that the trial court erred in denying his motion for a change of venue. Prior to trial, Appellant argued that he could not receive a fair trial because of publicity surrounding the trial for the incident at hand, and a trial which was occurring at the same time for a separate crime. The State argues that Appellant has not shown that the trial court abused its discretion and, therefore, the denial of the motion for change of venue should not be reversed.

A change of venue may be granted "when a fair trial is unlikely because of undue excitement against the defendant in the county where the offense was committed or for any other cause." Tenn. R. Crim. P. 21(a) (2006). A motion for change of venue is left to the sound discretion of the trial court, and the court's ruling will be reversed on appeal only upon a clear showing of an abuse of that discretion. *State v. Howell*, 868 S.W.2d 238, 249 (Tenn. 1993); *State v. Hoover*, 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979). The mere fact that jurors have been exposed to pretrial publicity will not warrant a change of venue. *State v. Mann*, 959 S.W.2d 503, 531-32 (Tenn. 1997). Similarly, prejudice will not be presumed on the mere showing of extensive pretrial publicity. *State v. Stapleton*, 638 S.W.2d 850, 856 (Tenn. Crim. App. 1982). In fact, jurors may possess knowledge of the facts of the case and may still be qualified to serve on the panel. *State v. Bates*, 804 S.W.2d 868, 877 (Tenn. 1991). Before a conviction will be overturned on a venue issue, the appellant must demonstrate on appeal that the jurors were biased or prejudiced against him. *State v. Melson*, 638 S.W.2d 342, 360-61 (Tenn. 1982). The test is whether the jurors who actually sat on the panel and rendered the verdict and sentence were prejudiced. *State v. Kyger*, 787 S.W.2d 13, 18-19 (Tenn. Crim. App. 1989). This Court has quoted the United States Supreme Court and stated the following:

> "[E]xtensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial unconstitutionally unfair," and the court may not presume unfairness based solely upon the quantity of publicity "in the absence of a 'trial atmosphere . . . utterly corrupted by press coverage.'"

*State v. Crenshaw*, 64 S.W.3d 374, 387 (Tenn. Crim. App. 2001) (quoting *Dobbert v. Florida*, 432 U.S. 282, 303 (1977) (quoting *Murphy v. Florida*, 421 U.S. 794, 798 (1975))). The burden of proof is on the defendant to show that the jurors were biased or prejudiced against him. *Id*. at 394; *see also State v. Blackwell*, 664 S.W.2d 686, 689 (Tenn. 1984); *State v. Garland*, 617 S.W.2d 176, 187 (Tenn. Crim. App. 1981).

However, in the case at hand, the record on appeal does not include a transcript of the jury voir dire. This Court has previously stated:

> The absence of the voir dire in the record prevents us from assessing [the *Hoover*] factors. In the absence of a complete record, we must presume that the trial court correctly denied the motion for a change of venue. *State v. Burton*, 751 S.W.2d 440, 451 (Tenn. Crim. App. 1988) (presuming that the jury was fair and impartial when the defendant failed to include the transcript of voir dire).

*Crenshaw*, 64 S.W.3d at 387.

Therefore, Appellant is not entitled to relief on this issue.

### Denial of Appellant's Request for Judge's Recusal

Appellant argues that the trial court erred in denying Appellant's request for the trial judge to recuse himself. The State argues there was no error.

At the same time pretrial motions for the incident at hand were being litigated, Appellant had another murder case pending, which was known as the Ballis Tourist Home Murder case. In a hearing held on October 27, 2006, the trial judge was setting the trial dates for the case at hand and the Ballis Tourist Home Murder. The trial judge stated that he was not going to sit on the Ballis Tourist Hoome Murder case because it occurred in October 2004, while the trial judge was still with the District Attorney's office. Although he stated that he had knowledge about the case and felt that it would not be appropriate for him to preside over the Ballis Tourist Home Murder case, he specifically stated that he neither supervised anyone who worked on the case nor was he involved in any investigation.

Prior to trial, Appellant filed a motion requesting the trial judge to recuse himself in the case at hand. At a hearing on the motion on December 4, 2009, the trial court made the following statement before denying the motion:

[T]his offense occurred June – allegedly June 1ˢᵗ, 2006. At that time I was not employed by the district attorney's office. So I wasn't – didn't meet with law enforcement about it; didn't know anything about it other than the fact that ultimately [Appellant] was – was charged.

In fact it didn't – in fact I don't think – it didn't go to the grand jury until October of 2006, which was after I became a judge. So, you know, I wasn't involved in any way in – in investigating or advising law enforcement about this – about this case.

Now, of course, as I've stated before, I was in the district attorney's office when [Appellant] was being – when the other offense occurred behind Ballis Tourist Home, for which he has ultimately been found guilty by – in a jury trial. But, again, that was not a case that I advised law enforcement about.

I mean, as I say, I – I knew that it had occurred. I think I had heard that a person was – that – that a person was being looked at. But as to who it was or anything about it, I – you know, I – I just didn't know anything. So I don't see how in any way I would have a conflict in being able to hear the trial.

When deciding whether to grant a motion for recusal, a trial judge exercises his or her discretion. *Caruthers v. State*, 814 S.W.2d 64, 67 (Tenn. Crim. App. 1991). This Court may reverse the trial judge's decision only when the judge has clearly abused that discretionary authority. *State v. Cash*, 867 S.W.2d 741, 749 (Tenn. Crim. App. 1993). The judge should recuse himself or herself whenever the judge's "impartiality [could] reasonably be questioned." *Alley v. State*, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994) (quoting Code of Judicial Conduct, Canon 3(c) (now part of Tenn. Sup. Ct. R. 10, Canon 3(E)(1)); *see also Smith v. State*, 357 S.W3d 322, 241 (Tenn. 2011). Furthermore, recusal is appropriate "when a person of ordinary prudence in the judge's position . . . would find a reasonable basis for questioning the judge's impartiality." *Id.* (footnote omitted). The trial judge must determine whether he or she has a subjective bias against the defendant and whether the trial judge's impartiality could reasonably be questioned under an objective standard. *State v. Connors*, 995 S.W.2d 146, 148 (Tenn. Crim. App. 1998).

A judge's duty to recuse springs from a constitutional source; Article VI, section 11 of the Tennessee Constitution provides that "[n]o Judge of the Supreme or Inferior Courts shall preside on the trial of any cause in the event of which he may be interested . . . ." Our state supreme court has explained that "[t]he purpose of Article 6, § 11 of our Constitution is to insure every litigant the cold neutrality of an impartial court." *Leighton v. Henderson*, 414 S.W.2d 419, 421 (Tenn. 1967).

In addition, it is well established that not every appearance of bias, partiality, or prejudice merits recusal. "To disqualify, prejudice must be of a personal character, directed at the litigant, must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from . . . participation in the case." *Alley*, 882 S.W.2d at 821(internal quotation omitted). Moreover, "[a]dverse rulings by a trial court are not usually sufficient grounds to establish bias" and "[r]ulings of a trial judge, even if erroneous, numerous and continuous, do not, without more, justify disqualification." *Id.*

Appellant argues that the trial judge should have recused himself because of his former employment with the District Attorney's office and possible exposure to the facts of this case. While it is true that the Ballis Tourist Home Murder case was being investigated while the trial judge was still employed at the District Attorney's office, he had no direct connection with that case. Furthermore, the incidents at hand occurred after the trial judge was no longer with the District Attorney's office. We fail to see how the fact that the trial judge had been employed by the District Attorney's office before the incident at hand occurred could in any way call into question the trial judge's impartiality. Therefore, we conclude that there was no reason for the trial judge to recuse himself in this case.

This issue is without merit.

## Juror Contact-Denial of Mistrial

Appellant also argues that the trial court erred in denying his request for a mistrial stemming from a juror's contact with the investigating officer, Detective Cole. The State argues that the trial court did not err in denying the motion.

The decision whether to grant a mistrial is within the discretion of the trial court and that decision will not be disturbed on appeal unless there was an abuse of discretion. *State v. Reid*, 91 S.W.3d 247, 279 (Tenn. 2002); *State v. Smith*, 871 S.W.2d 667, 672 (Tenn. 1994). Moreover, the burden of establishing the necessity for a mistrial lies with the party seeking it. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *Id.* Generally, a mistrial will be declared and the jury discharged in a criminal case only if there is "manifest necessity" requiring such

action by the trial judge. *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977)).

When there is inappropriate contact between a witness and a juror and the jury is sequestered, the State has the burden of showing that no prejudice occurred. *Gonzales v. State*, 593 S.W.2d 288, 291-93 (Tenn. 1980). However, in *State v. Blackwell*, 664 S.W.2d 686 (Tenn. 1984), our supreme court stated that when the issue involves an unsequestered jury:

> [S]omething more than a bare showing of a mingling with the general public is required where the jury is not sequestered to shift the burden of proof to the State of showing no prejudice. That additional requirement is that as a result of a juror's contact with a third person some extraneous prejudicial information, fact or opinion, was imported to one or more jurors or some outside improper influence was brought to bear on one or more jurors.

*Blackwell*, 664 S.W.2d at 689.

The trial court set out the following facts regarding the incident:

> [A]s we adjourned and everybody was asked to stand by, the bailiff, the Sergeant, the jurors, all the jurors turned to go out of the courtroom, were facing away from the audience and as well as from the tables. The only one was Mr. Hartgrove and Mr. Hartgrove reached over and of course Detective Cole sitting or standing right at the State's table where he had been all during trial was standing there and Mr. Hartgrove initiated, just leaned over and stuck his hand out to shake apparently Detective Cole's hand. I think Detective Cole, based on the look on his face, was as surprised as everybody else was. None of the other jurors were looking in that direction and none of them were talking to Mr. Hartgrove. They all were facing out. In fact I don't even think anybody from the District Attorney's table even saw it. They were watching jurors so, you know, I don't think that fact, based on the circumstances under which it was done, it was at the end of the day, there wasn't any further discussion with Mr. Hartgrove and the remainder of the jury panel.

As a result of the handshake, Juror Hartgrove was excused from the jury. The jury was informed that he was excused, but the trial court did not give any explanation to the jury as to why Juror Hartgrove had been excused.

Appellant initially moved for a mistrial based on the handshake, and the trial court denied it because there were alternate jurors available, and Juror Hartgrove could be excused. The next morning, Appellant again requested a mistrial based upon the fact that Juror Hartgrove often spoke with another juror. Juror Stanley Johnson was voir dired by the trial court regarding his communications with Juror Hartgrove. Juror Johnson told the trial court that he and Juror Hartgrove did not speak about what was occurring in the courtroom. He also stated that he had not spoken to any witnesses. He admitted that he had spoken with Juror Hartgrove on the previous day, when the handshake occurred, but Juror Johnson could not recall the topic of their conversation. The trial court was satisfied and denied the motion for a mistrial.

The State argues that Appellant has not shown that any jurors were exposed to either extraneous prejudicial information or improper influence and that there is no presumption of prejudice. Therefore, the State argues, the burden had not been shifted to the State to prove that there was no prejudice as set out in *Blackwell*.

We agree with the State. Juror Hartgrove shook hands with Detective Cole. According to the trial court, there was no conversation and the rest of the jury did not see the contact. Juror Hartgrove was immediately excused as a juror. When the issue of contact with Juror Johnson was raised, the trial court voir dired Juror Johnson, and no inkling of extraneous prejudicial information or improper influence was shown. Because there was no extraneous prejudicial information or improper influence, the burden did not shift to the State. Appellant has not shown that there was any prejudice as a result of the contact between Juror Hartgrove and Detective Cole. We conclude that the trial court did not abuse its discretion by denying Appellant's motion for a mistrial.

This issue is without merit.

### Prosecutorial Misconduct During Closing Argument

Appellant argues that the State committed prosecutorial misconduct during closing argument because the State erroneously told the jury that Appellant's DNA had been found on the baseball bat that had been recovered during the investigation. Appellant argues that this misstatement was highly prejudicial and constitutes reversible error. The State argues that Appellant failed to contemporaneously object to the statement and, therefore, waived this

issue. The State also argues that Appellant cannot prove plain error and, for this reason, Appellant cannot be successful on this issue.

During closing argument, the State summarized the DNA evidence that had been presented during the trial. In that section of closing argument, counsel stated that Appellant's DNA was found on the steering column of Appellant's truck and DNA from another person, of which Ms. Walton was a likely contributor, was also found on the steering column of Appellant's truck. During the rebuttal to Appellant's closing argument, counsel for the State made the following argument:

> There is evidence that links them and it is that truck. All the evidence is, is that [Appellant] drove the truck. [Appellant] put a brick under the hood. [Appellant] drove that truck to the river. [Appellant] opened up the hood and threw out the bat. And that bat, where did it come from? All the evidence is that bat came from the scene. . . . And how do we know it came from that apartment, because it had blood on it. Not just any kind of DNA, it had blood. It had a mixture of blood. And whose blood was mixed in it? [Appellant]. Who else was in that apartment other than [Appellant] killing these two people? Nobody. So it makes sense that [Appellant's] blood is mixed in with these three markers. And use your common sense. Aisha Walton could not be excluded, nor should she be. Who else was killed with a baseball bat laying in their apartment and wearing a robe that only [Appellant] knew about?

During the trial, the TBI agent testified that a partial DNA profile was recovered from the baseball bat and it matched Ms. Walton. Appellant's DNA was not on the baseball bat. Appellant did not object to this statement during the State's argument. Immediately after argument and before deliberation, the trial court and counsel discussed the erroneous statement. Counsel for the State explained that he had meant to say steering column. Appellant asked the trial court to instruct the jury about the erroneous statement. The trial court replied that it could repeat the instruction previously given that the arguments of counsel are not evidence, but the trial court refused to comment on any specific parts of the evidence. Appellant agreed to the trial court's offer to repeat the instruction regarding counsel's arguments. The trial court gave a curative instruction to the jury stating that the arguments of counsel are not evidence.

Appellant failed to object to the statement during closing argument. Typically when a prosecutor's statement is not the subject of a contemporaneous objection, the issue is waived. Tenn. R. Crim. P. 33 and 36(a); *see also State v. Thornton*, 10 S.W.3d 229, 234

(Tenn. Crim. App. 1999); *State v. Green*, 947 S.W.2d 186, 188 (Tenn. Crim. App. 1997); *State v. Little*, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992).

Because Appellant did not object to the statement at trial, if this Court is to review the claims of prosecutorial misconduct, we must do so through the process of "plain error" review embodied in Rule 36(b) of the Tennessee Rules of Appellate Procedure, which provides, "When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."[1]

This Court has, in its discretion, from time to time reviewed allegations of prosecutorial misconduct as "plain error" even in the absence of a contemporaneous objection. *See, e.g., State v. Marshall*, 870 S.W.2d 532 (Tenn. Crim. App. 1993), *overruled on other grounds by State v. Carter*, 988 S.W.2d 145 (Tenn. 1999) (determining in absence of objection that prosecutor's jury argument was not plain error); *State v. Butler*, 795 S.W.2d 680 (Tenn. Crim. App. 1990) (considering whether statements of prosecutor were plain error despite lack of objection by defendant); *Anglin v. State*, 553 S.W.2d 616 (Tenn. Crim. App. 1977) (determining that in order to justify reversal on the basis of improper argument and remarks of counsel in absence of objection, it must affirmatively appear that the improper conduct affected the verdict to the prejudice of the defendant). However, appellate courts are advised to use it sparingly in recognizing errors that have not been raised by the parties or have been waived due to a procedural default. *State v. Bledsoe*, 226 S.W.3d 349, 354 (Tenn. 2007).

In exercising our discretion as to whether plain error review under Rule 36(b) of the Tennessee Rules of Appellate Procedure is appropriate, the Tennessee Supreme Court has directed that we examine five factors: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the defendant must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. *See State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (citing *State v. Adkisson*, 899 S.W.2d 626, 641 (Tenn. Crim. App. 1994)). All five (5) factors must be present for plain error review. *Smith*, 24 S.W.3d at 283.

---

[1]This rule by its terms allows plain error review only where there is a failure to allege error in the new trial motion or where the error is not raised before the appellate court. Nevertheless, the rule has been interpreted by the appellate courts to allow appellate review under some circumstances in the absence of a contemporaneous objection as well. This language was formerly contained in Rule 52(b) of the Tennessee Rules of Criminal Procedure.

For a "substantial right" of the accused to have been affected, the error must have prejudiced the appellant. In other words, it must have affected the outcome of the trial court proceedings. *United States v. Olano*, 507 U.S. 725, 732-37 (1993) (analyzing Rule 52(b) of the Federal Rule of Criminal Procedure); *Adkisson*, 899 S.W.2d at 642. This is the same type of inquiry as the harmless error analysis under Rule 36(b) of the Tennessee Rules of Appellate Procedure, but the appellant bears the burden of persuasion with respect to plain error claims. *See Olano*, 507 U.S. at 732-37.

In *State v. Bledsoe*, 226 S.W.3d 349 (Tenn. 2007), our supreme court revisited the question as to when an issue should be considered under the plain error doctrine. 226 S.W.3d at 353-55. In its analysis, the supreme court stressed that appellate courts should use plain error sparingly. *Id.* at 354. The court then stated the following:

> [A]n error "may be so plain as to be reviewable . . . , yet the error may be harmless and therefore not justify a reversal." *United States v. Lopez*, 575 F.2d 681, 685 (9th Cir. 1978); *see Adkisson*, 899 S.W.2d at 642. The magnitude of the error must have been so significant "'that it probably changed the outcome of the trial.'" *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)); *see also United States v. Douglas*, 818 F.2d 1317, 1320 (7th Cir. 1987).

It is the accused's burden to persuade an appellate court that the trial court committed plain error. *See Olano*, 507 U.S. at 734. Further, our complete consideration of all five of the factors is not necessary when it is clear from the record that at least one of them cannot be satisfied. *Smith*, 24 S.W.3d at 283.

In general, the scope of closing argument is subject to the trial court's discretion. Counsel for both the prosecution and the defense should be permitted wide latitude in arguing their cases to the jury. *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998). However, argument must be temperate, "predicated on evidence introduced during the trial," and relevant to the issues being tried. *State v. Keen*, 926 S.W.2d 727, 736 (Tenn. 1994). Thus, the State must not engage in argument designed to inflame the jurors and should restrict its comments to matters properly in evidence at trial. *State v. Hall*, 976 S.W.2d 121, 158 (Tenn. 1998).

When a reviewing court finds improper argument, *State v. Philpott*, 882 S.W.2d 394 (Tenn. Crim. App. 1994), sets out five factors to determine whether a prosecutor's improper conduct could have affected the verdict to the "prejudice of the defendant." *Id.* at 408. The factors are: (1) the conduct complained of in light of the facts and circumstances of the case;

(2) the curative measures undertaken; (3) the intent of the prosecutor in making the improper remarks; (4) the cumulative effect of the improper conduct and any other errors in the record; and, (5) the relative strength or weakness of the case. *Id.* (citing *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); *see also State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

In *State v. Goltz*, 111 S.W.3d 1 (Tenn. Crim. App. 2003), this Court set out the following five recognized areas of prosecutorial misconduct related to argument of counsel:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. *See State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); *Lackey v. State*, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); Tenn. Code of Prof'l Responsibility DR 7-106(c)(4).

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. *See Cauthern*, 967 S.W.2d at 737; *State v. Stephenson*, 878 S.W.2d 530, 541 (Tenn. 1994).

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. *See Cauthern*, 967 S.W.2d at 737; *State v. Keen*, 926 S.W.2d 727, 736 (Tenn. 1994).

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

111 S.W.3d at 6.

In the case at hand, the argument complained of does not fall into any of the above-listed categories. The only possible category is the first, intentionally misleading the jury. However, there is no evidence in the record to support that conclusion. Even Appellant's counsel stated during the discussion that he knew that counsel for the State had not misstated

the evidence intentionally. For this reason, we conclude that while it was an erroneous statement, it was not an intentionally improper argument so as to require analysis as to its potential effect on the jury's verdict.

We conclude that Appellant cannot meet the five factors necessitating plain error review. Specifically, Appellant has not shown that a clear and equivocal rule of law has been breached. As stated above, the erroneous statement does not fall within any of the recognized categories of prosecutorial misconduct.

Furthermore, Appellant has not proven that a substantial right has been violated such that the outcome of the trial would have been different. There was evidence presented and counsel for the State stated that Ms. Walton's DNA was present mixed with Appellant's DNA on the steering column of Appellant's truck. The erroneous statement that the mixed DNA was on the baseball bat instead is not sufficient to change the outcome of the trial, especially in light of the damning testimony of Appellant's mother and brother, and Appellant's own statement. Therefore, Appellant has not met the requirement to trigger plain error review.

This issue is without merit.

### Introduction of Appellant's Statement

Prior to trial, Appellant filed a motion to suppress Appellant's statement to the police. Appellant argues on appeal that the trial court incorrectly denied his suppression motion because the statement entered into evidence was not signed by Appellant, was coerced after several hours of interrogation, and Appellant lacked the capacity to understand because of his mental condition and the fact that he was inebriated. The State contends that the motion was properly denied.

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id.* at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews de novo the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 775, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999).

The Fifth Amendment to the United States Constitution provides in pertinent part that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, Article I, Section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. However, an accused may waive this right against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436 (1966). In *Miranda*, the United States Supreme Court held that a suspect "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* at 479. The Supreme Court held that a suspect may knowingly and intelligently waive the right against self-incrimination only after being apprised of these rights. *Id.* Accordingly, for a waiver of the right against self-incrimination to be constitutionally valid, the accused must make an intelligent, knowing, and voluntary waiver of the rights afforded by *Miranda*. *Id.* at 444. In considering the totality of the circumstances a court should consider:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996) (citing *State v. Readus*, 764 S.W.2d 770, 774 (Tenn. Crim. App. 1988)). However, no single factor is necessarily determinative. *State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000) (citing *Fairchild v. Lockhart*, 744 F. Supp. 1429, 1453 (E.D. Ark.1989)). Further, "[a] trial court's determination that a confession was given knowingly and voluntarily is binding on the appellate courts unless the defendant can show that the evidence preponderates against the trial court's ruling." *State v. Keen*, 926 S.W.2d 727, 741 (Tenn. 1994).

A court may conclude that a defendant voluntarily waived his rights if, under the totality of the circumstances, the court determines that the waiver was uncoerced and that the defendant understood the consequences of waiver. *State v. Stephenson*, 878 S.W.2d 530, 545

(Tenn. 1994). In order to be considered voluntary, the statement "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Bram v. United States*, 168 U.S. 532, 542-43 (1897); *see also State v. Kelly*, 603 S.W.2d 726, 727 (Tenn. 1980). However, "[a] defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996). Instead, "'coercive police activity is a necessary predicate to finding that a confession is not voluntary . . . .'" *Id.* (quoting *State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn. 1994)).

The trial court held a hearing on March 6, 2009, on Appellant's motion to suppress his statement. Agent McCauley and Detective Cole both testified at the hearing. The following evidence was presented at the hearing. On June 6, 2006, Agent McCauley and Detective Cole conducted an interview of Appellant with regard to the murder of the victims in the case at hand.

Agent McCauley testified that Appellant was responsive to their questions and did not appear to be under the influence of drugs or alcohol. Appellant was able to provide both his social security number and his date of birth. Appellant did not tell the officers that he was under the influence of drugs or alcohol or that he was suffering from any physical, medical or mental problems. Agent McCauley stated that he and Detective Cole did not use threats, force, or physical coercion during their interview of Appellant.

Appellant was advised of his *Miranda* rights. Agent McCauley used the standard form used by the TBI. Appellant said that he understood his rights after Agent McCauley went over them. Agent McCauley also read the waiver of rights form to Appellant. Although Appellant said he understood the waiver of rights, he refused to sign the form. Appellant said that he still wanted to speak with the officers even though he refused to sign the form. Agent McCauley testified that Appellant never asked for a lawyer during the interview.

After going over the *Miranda* rights and the waiver of rights form, the officers began to interview Appellant. According to Agent McCauley's notes, Appellant stated, "I understand them, but I ain't signing nothing." The officer brought Appellant some tea before beginning the interview at 8:26 p.m. Detective Cole questioned Appellant, and Agent McCauley took notes. Agent McCauley prepared a statement from the notes. He sat close enough to Appellant so that Appellant could see the statement as Agent McCauley prepared it. Agent McCauley asked Appellant for input and made corrections to the statement to which Appellant agreed. However, Appellant refused to initial the changes on the written statement. He also refused to sign the statement at the end.

In his first statement, Appellant admitted that he knew the victim, Mr. Thacker, and that he went to Mr. Thacker's home on occasion to buy drugs. Appellant stated that he took another friend to Mr. Thacker's a few days before the interview, but Mr. Thacker was not there. He also stated more than once that he liked Mr. Thacker and that Mr. Thacker did not owe him anything.

At 9:36 p.m., the officers stopped the interview and brought food for Appellant. After Appellant ate, the interview resumed at 10:11 p.m., and Detective Bellamy joined the interview. Agent McCauley resumed taking notes of the interview. They stopped for a bathroom break at 10:51 p.m. The interview resumed at 10:54 p.m. and continued until 11:30 p.m. This part of the interview resulted in the following statement from Appellant:

> You want to know the truth? I took my brother Henry up there and he cut them up. I want to cut a deal. We were in my truck. Henry said he had money to buy dope. I don't know why he wanted to borrow my shorts, shirt and boots. He asked me if I knew anybody that had anything. He's been up to Glen's before.

> Henry and his girlfriend Sandy got it worser than I got it. I took Henry up there Thursday 6/01/06. It was late. I swear to God I don't know what time it was, but it was way after dark. I drove and I parked around back and Henry walked up there. I sat in the truck. I was also up there Thursday day.

> Henry came back after about 10-15 minutes because Glen makes you wait 10-15 minutes because of traffic. Henry asked me to pop the hood and he put something in there.

> We then go to Henry's house. I stayed there all night and used some cocaine. We then went to Yuma. He said, "Pop the hood," and told me to throw it away and I did. It was some kind of bat with a bag wrapped around it. Henry then told me to throw my clothes away. He handed them to me and I slung them. My clothes were in my truck and he just slipped them on. He then said, "Let's ride through Yuma Tide and Recapping so somebody would know we were up there in Yuma. . . .

> . . . .

My clothes were a dark colored (probably blue) tee shirt, a pair of cut-off jeans and my boots. I threw all the clothes into the river. The boots are down in Yuma along the road. I can take you and show you where.

. . . .

I did not kill Glen and the girl. I don't know the girl's name and didn't even know his last name. I did go up to the house. I didn't stay in the truck. I left Glen and the girl and Henry in the house and went and waited in the apartment parking lot behind Glen's . . . .

At 11:30 p.m., Appellant asked if he could call his mother. Detective Bellamy called his mother, and she agreed to speak with Appellant. Appellant spoke with her from 11:50 p.m. to 12:10 a.m. When he returned, the third statement resulted from the interview:

Glen told his girlfriend to get a pistol and get my Lortab, so I hit him with a bat. He layed [sic] there where you found him. He didn't fall after I hit him the first time. I'm telling you I done it, ain't that enough?

Monty told me that Glen had 9 or 10 guns in the house. I came around the corner and she had her right hand, I think, near her hip, so I hit her too. The bat was in his house. I don't know how many times I hit them. Glen was breathing when I left. He was not bleeding a lot when I left. I don't remember if Glen was face up or face down.

Henry did not do any of this. I did it all myself.

Glen was laying in the living room and she was laying in the hallway. I hit him while he was sitting on the couch at first and he stood up and I hit him again. I hit her I don't think no more than two times.

. . . .

At first, she was sitting in the living room too and I showed him the Lortabs and he told her to get a gun. I was going to trade Glen my Lortabs for cocaine.

-20-

The cocaine was laying on the table in front of the couch that was in two bags. There was a big bag and a little bag of powder cocaine. I pulled the door closed as I left. I didn't touch any of the windows or screens. I didn't look for anymore drugs in Glen's house. I got the coke and got the hell out of there. I got his oxys too. They were in a little bottle. There were five of them. I did ½ of one. I gave Henry two. I gave Sandy one and had one stole because I was so messed up.

Seems like it was a wooden bat with some tape on it. It's in the river. I had it hid under the hood in my truck. I put a bag around the bat to hide it. Actually, my clothes may not have blood on them. I threw them in the river just because I was wearing them.

Henry threw my light brown boots, not cowboy boots, out the window of my truck on Yuma Road. I think I told Henry that Glen got what he deserved.

The bat was propped up next to the couch where I could grab it. I guess he just thought he'd scare me and I'd leave my pills and just leave. I think the girl was wearing some kind of robe.

Me, Henry and Sandy used up pretty much all the coke. They brought some woman who bought some of it, but she said she didn't like it.

He was breathing when I left. He was breathing real hard. The only reasons I hit them was because I thought they were going to shoot me and take my Lortabs. I'm not sure which hand the girl had down by her side.

All this information is true to the best of my knowledge. End of statement.

This part of the interview concluded at 2:56 a.m. Appellant told Agent McCauley that the statement was correct, but Appellant refused to sign it. The statement was witnessed by Agent McCauley and Detective Bellamy.

Detective Bellamy also testified at the hearing on the motion to suppress. He agreed with Agent McCauley's testimony. Detective Bellamy arrived after the initial statement was made. He placed the telephone call to Appellant's mother and allowed Appellant to speak with her privately. Detective Bellamy testified that Appellant did not appear to be under the

influence of drugs or alcohol. He stated that they never used force or coercion to obtain Appellant's statement. Detective Bellamy also stated that Appellant never asked for an attorney or invoked his *Miranda* rights. Appellant agreed to speak, but simply would not sign the forms or statement.

Appellant also testified at the hearing. His version of events differs greatly from Agent McCauley and Detective Bellamy. He stated that he told the officers that he did not want to speak with them. At the hearing, Appellant testified that he asked for a lawyer during the interview. According to Appellant, the officers did not go over his *Miranda* rights until after the interview had been completed. He maintains that he was not asked to sign a waiver at the beginning. He said that he told them several times he did not want to speak with them and asked several times for a lawyer. However, the officers continued to ask him questions, and he told them some things.

With regard to the first statement, Appellant said that he did not admit to killing anyone. The officers asked him questions, and he answered them. The questions did not contain references to other people or facts. He repeated that he told Detective Cole that he did not want to answer any questions, but Detective Cole continued to ask them.

Appellant claimed that when Detective Bellamy arrived he told Appellant that the officers knew that Appellant drove to Yuma with his brother and that they threw Appellant's clothes and boots out of the moving truck. When Detective Bellamy asked him if they had done that, Appellant replied that he had not. Appellant subsequently gave his statement claiming that his brother had committed the murders. Appellant claimed that he began to fabricate information so that they would leave him alone and take him back to his cell. He admitted that some things he told the officers about his brother were not true.

Appellant further testified that Detective Bellamy stood right next to him while Appellant was speaking with his mother. He said that after his telephone call with his mother, Detective Cole called him an S.O.B. and told Appellant that he knew Appellant killed the people in the Ballis Tourist Home murder and got away with it, so Detective Cole was going to take Appellant down for these murders.

Appellant stated that after this altercation he gave a third version of the story. He told the officers that he hit the victims with a bat. According to Appellant, the officers were feeding him information while they were asking him questions. Appellant stated that when the statement was completed and written down, the officers did not show it to him. He said that they only read it to him. He testified that he refused to initial the corrections and sign the statement because he did not want to speak with them from the beginning. He stated that he told the officers what they wanted to hear so he could "get it over with."

Prior to cross-examination, Appellant stipulated to the fact that he had prior convictions for theft, DUI, and aggravated burglary. On cross-examination, Appellant admitted that Detective Cole and Agent McCauley did not use any type of force or coercion during the interrogation. He agreed that he continued to speak with the officers after asking for an attorney, as he claimed. He stated that he knew he did not have to speak with the officers.

At the conclusion of the hearing, the trial court denied the motion to suppress. The trial court made the following ruling:

I find that certainly [Appellant] was in custody. Whether he had been quote "arrested" on the particular charge or not is a whole other issue but he was in custody. I also find that he was advised of his rights to an attorney and I also find even though his testimony here is, is that he didn't waive those rights and he told them that he wanted an attorney and he wasn't going to talk to them without an attorney, I accredit the testimony of the officers, that indeed he waived that right and never at any point in time invoked his right to an attorney. I find that the statement that he made was a – that he made a knowing and intelligent waiver of that right and that the statement that he made was not forced or coerced or – and based on the testimony of the officers that it was not suggested. I mean [Appellant's] testimony here today is that he made the decision to just go ahead and make stuff up because he thought that's what the officer wanted and they weren't going to leave him alone and let him go back into a cell unless he did that and that he was tired but at the same time there's – you know, he had the presence of mind to ask about talking to his mother and as I say he does have prior theft convictions which are certainly factors with regard to credibility but I've heard him on the stand here today and I don't find that his explanation about where this statement came from and how he made it is very credible. So I'm going to deny your motion to suppress the statement . . . .

Initially we point out that Appellant's brief does not contain an argument as to how the fact that the statement was unsigned violated his Fifth Amendment rights. He merely states that the statement was unsigned and should have been suppressed. Appellant does not argue that he did not waive his rights under *Miranda* in making a statement to the officers. Furthermore, he was unable to prove that he did not voluntarily waive his rights. The trial court found that Appellant's testimony was not credible. Even if we were to assume that his

testimony that he requested an attorney is true, he cannot prevail on the waiver issue because he admitted at the hearing that he continued to speak with officers of his own volition. We conclude that Appellant has not shown by a preponderance of the evidence that he did not waive his *Miranda* rights voluntarily.

With regard to his mental state and inebriation, we conclude that Appellant has also failed to show that he did not understand his waiver. Initially, we point out that in its findings, the trial court found that the testimony of the officers was credible and the testimony of Appellant was not credible. The officers testified that Appellant denied that he was on any kind of illegal substance and that he did not seem to be under the influence of any mind-altering substance. In addition, the evidence does not preponderate against the trial court's findings that Appellant had the presence of mind to ask to speak with his mother. The trial court's conclusion that Appellant had the mental wherewithal to understand the proceedings is supported by the record.

Appellant's main argument is that his statement was the result of coercion and force. He bases his argument that the statement was produced through coercive tactics on his own testimony at the hearing on the motion to suppress. However, the trial court expressly found the testimony of the officers to be credible and that of Appellant to be not credible. As stated above, when reviewing a motion to suppress, the trial court's findings of fact must be upheld unless the evidence preponderates otherwise. *Odom*, 928 S.W.2d at 23. There is no other evidence in the record that Agent McCauley confronted Appellant or raised his voice besides the testimony of Appellant which the trial court found to be not credible. Therefore, the evidence does not preponderate against the findings of the trial court. We conclude that the statement was not produced through force or coercion.

As stated above, "A trial court's determination that a confession was given knowingly and voluntarily is binding on the appellate courts unless the defendant can show that the evidence preponderates against the trial court's ruling." *State v. Keen*, 926 S.W.2d 727, 741 (Tenn. 1994). In the case herein, we determine that Appellant has failed to establish that the evidence preponderates against the trial court's determination that the statement was freely and voluntarily given.

Therefore, this issue is without merit.

### Exclusion of Dr. Stanley's Testimony

Appellant argues that the trial court erred in excluding the testimony of his expert witness, Dr. Charlton Stanley. In his brief, Appellant sets out the following argument, "Dr. Stanley would have provided expert proof substantially assisting the trier of fact regarding

the suggestibility of persons suffering from [Appellant's] combination of mental infirmities and the unreliability of statements made by such persons." The State argues that there was no error.

The Tennessee Rules of Evidence embody, and our courts traditionally have acknowledged, "a policy of liberality in the admission of evidence in both civil and criminal cases . . . ." *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978); *see also State v. Robinson*, 930 S.W.2d 78, 84 (Tenn. Crim. App. 1995). To be admissible, evidence must satisfy the threshold determination of relevancy mandated by Rule 401 of the Tennessee Rules of Evidence. *See, e.g., Banks*, 564 S.W.2d at 949. Rule 401 defines "relevant evidence" as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Tenn. R. Evid. 403; *see also Banks*, 564 S.W.2d at 951. The determination of relevancy is left to the discretion of the trial court, and this Court will not overturn a trial court's determination in this regard in the absence of an abuse of discretion. *State v. Forbes*, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995).

Rule 702 of the Tennessee Rules of Evidence governs the admissibility of expert testimony. It provides, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702.

When an appellant bases an appeal on the exclusion of testimony, an offer of proof must be made so that the appellate court may make a proper determination as to whether the exclusion of the evidence was reversible error. *State v. Goad*, 707 S.W.2d 846, 852-52 (Tenn. 1986). This Court has stated that when an expert witness's testimony is excluded, such an offer of proof is required of the expert's testimony. *State v. Robinson*, 73 S.W.3d 136, 150-51 (Tenn. Crim. App. 2001). In the case at hand, there was an offer of proof of Dr. Stanley's testimony, and it was included in the record.

Prior to trial, Appellant offered Dr. Stanley as an expert witness to testify about Appellant's mental state and the effect of this mental state on his statement to officers during the interrogation. The State filed a motion in limine to prevent the presentation of Dr. Stanley's testimony at Appellant's trial.

Dr. Stanley testified that he is a psychologist specializing in forensic psychology. He stated that he interviewed Appellant as well as reviewed a great deal of Appellant's previous

psychological information and medical records. Dr. Stanley testified that based upon his interviews and review of Appellant's medical records, he concluded that Appellant had an ongoing psychiatric diagnosis of bipolar disorder. Appellant's counsel asked Dr. Stanley about the statement Appellant gave to the officers. Dr. Stanley stated that, "when a person is delusional or thought disordered and their conduct with reality is not good it's not at all unusual for them to make multiple statements that are internally inconsistent." Appellant's counsel stated that Appellant's statement contained multiple stories. Dr. Stanley opined that with Appellant's psychiatric diagnosis, "[w]e have no way of knowing which of the three statements are true or if any of them are true."

On cross-examination, counsel for the State asked Dr. Stanley whether there could be another explanation for the three versions of the story. Counsel for the State asked Dr. Stanley if a reason for giving different stories could be because someone is "trying to escape responsibility for what you've done and but when you're faced with the evidence and information against you at some point you decide to tell the truth." Dr. Stanley replied that, "It can and does happen." Dr. Stanley admitted that he had not reviewed the transcript from the suppression hearing in which Appellant and the officers set out the events of the interrogation. He also admitted that he did not interview the officers so he could get information about how the interview was conducted and what questions they asked Appellant.

At the conclusion of the hearing, the trial court granted the State's motion in limine. The trial court concluded that Dr. Stanley's testimony was not relevant to the question concerning the reliability of Appellant's statement given to police. The trial court stated the following:

> Dr. Stanley today did not ever interview the defendant with regard to [the confession], though he obviously has interviewed him but never interviewed him specifically with regard to the circumstances under which the confession was made. He never – I mean he acknowledged the fact that he didn't meet with any of the officers that were present when the interview was taken. There's also been testimony by the defendant at a previous hearing in which he testified to the circumstances under which the statement or confession was made. Dr. Stanley has not had a chance to review that. It's not a situation where – you know, experts have the ability to look at lots of different things for making their determination and giving their opinion. . . . But at this point in time I've not heard anything that would cause me to feel that Dr. Stanley's statements anyway at all relate to the circumstances under which the statement was given. And of course I'm not – that in turn means that I don't really have

-26-

to address the issue about quote "expert testimony" and whether or not it's been peer reviewed and all those other things, however two things that I think need to be noted is that Dr. Stanley, when he was asked the question about the statement and allegedly the three different parts of that statement, he said essentially that there was no way of knowing which one was true or if any were true. He was also asked – in response to you whether it was a false confession and he said "It could be." And in my opinion his responses with regard to that are basically just speculation and that he's not in any better position with regard to the circumstances of this particular statement and how it was made, as to whether or not it was true and/or whether or not it was made. So I find that his testimony is basically just, it's not relevant and therefore should not be admitted so I'm going to grant the State's motion.

We agree with the trial court that the issues surrounding the admission of expert witness testimony are not the initial hurdle. As the trial court stated, the first question is whether Dr. Stanley's testimony is even relevant considering he did not speak with Appellant about the interview, speak with the officers about the interview, or review Appellant's testimony about the interview.

In the case at hand, we find no abuse of discretion on the part of the trial court. For evidence to be relevant it must have the tendency to make the existence of a fact more probable or less probable. Tenn. R. Evid. 401. We agree with the trial court's assessment that Dr. Stanley's testimony that Appellant had an ongoing diagnosis of bipolar disorder does not make the truth of Appellant's statement more or less probable without further investigation by Dr. Stanley of the circumstances of the interview. Dr. Stanley himself testified that no one could know which of the three versions of events given by Appellant were true or even if any of them were true. He was not able to definitively state that Appellant's bipolar diagnosis affected the statement Appellant gave during the interview because Dr. Stanley simply did not know anything about the circumstances of the interview.

Therefore, this issue is without merit.

### Stun belt

Appellant argues that the trial court violated his right to a fair trial by requiring him to wear a stun belt during his trial. The State disagrees.

-27-

Every criminal defendant is guaranteed a fair and impartial trial through the concept of due process as presented in both the Tennessee and United States Constitutions. Within the presumption of innocence of a defendant is the right to the "physical indicia of innocence." *Willocks v. State*, 546 S.W.2d 819, 820 (Tenn. Crim. App. 1976) (citing *Kennedy v. Cardwell*, 487 F.2d 101, 104 (6th Cir. 1973), *cert. denied sub nom. Kennedy v. Gray*, 416 U.S. 959 (1974)). An important component of a fair and impartial trial is that a defendant brought into court for trial is entitled to appear free from all bonds or shackles. Because in-court shackling is inherently prejudicial "there should be a legal presumption against the necessity of in-court restraint, with the burden falling on the state 'to show the necessity of any extreme physical measures.'" *Willocks*, 546 S.W.2d at 821 (quoting *Kennedy*, 487 F.2d at 107).

Our supreme court recently specifically addressed the use of stun belts, as opposed to shackles, to restrain a defendant at trial. Our supreme court started its analysis by stating that stun belts "implicate[ ] many of the same principles of the use of shackles." *Brandon Mobley v. State*, No. E2010-00379-SC-R11-PC, 2013 WL 633201, ____ S.W.3d ___, at *26 (Tenn. Feb. 21, 2013). The court went onto apply the analysis set out in *Willocks v. State*, 546 S.W.2d 819 (Tenn. Crim. App. 1976), concerning the use of shackles. The court stated the following:

> Although we are disinclined at this point to hold that a stun belt may not be used as an in-court restraint on a criminal defendant, we agree with the aforementioned courts that have found that the use of a stun belt implicates many of the same principles as the use of shackles. We are loathe to approve the use of a stun belt without a finding of necessity simply because a stun belt is ordinarily not visible. Accordingly, we conclude that the principles and procedures set forth in *Willocks* apply to the use of a stun belt as an in-court restraint.
>
> To that end, we reiterate that there is a legal presumption against the use of in-court restraints. *Willocks v. State*, 546 S.W.2d at 821. To justify the use of restraints, the State bears the burden of demonstrating necessity that serves a legitimate interest, such as preventing escape, protecting those present in the courtroom, or maintaining order during trial. *State v. Thompson*, 832 S.W.2d at 580; *Willocks v. State*, 546 S.W.2d at 820. The trial court should consider all relevant circumstances, including without limitation: (1) the defendant's circumstances, such as record of past behavior, temperament, and the desperateness of his or her situation; (2) the state of the courtroom and courthouse; (3) the defendant's physical condition; and (4) whether there is a

less onerous but adequate means of providing security. *Lakin v. Stine*, 431 F.3d 959, 964 (6th Cir. 2005); *Kennedy v. Cardwell*, 487 F.2d at 110-11. The trial court should consider the relevant circumstances against the backdrop of affording the defendant the physical indicia of innocence, ensuring the defendant's ability to communicate with counsel, protecting the defendant's ability to participate in his or her defense and offer testimony in his or her own behalf, and maintaining a dignified judicial process. *See Deck v. Missouri*, 544 U.S. at 630-32.

The trial court must make particularized findings, and the better practice is to hold a hearing on the issue so that factual disputes may be resolved and evidence surrounding the decision may be adduced and made part of the record. *Willocks v. State*, 546 S.W.2d at 822. Only in this way will the record allow for meaningful appellate review. Of course, the decision to require the use of a stun belt is addressed to the sound discretion of the trial court. *State v. Thompson*, 832 S.W.2d at 580. . . .

*Id.* at *26-27.

In the case at hand, Appellant had a previous trial on these charges that resulted in a mistrial. Before that trial, the trial court determined that a stun belt was not warranted. Between the mistrial and the second trial, Appellant was convicted of first degree murder for the Ballis Tourist Home murder. Before the trial that is the subject of this appeal, the Sheriff's Office requested the use of a stun belt on Appellant during trial.

The trial court held a hearing on the matter. During the hearing, the Sheriff's Department assured the trial court that the stun belt would not be able to be seen by the jury. The Sheriff's Department testified that their primary reason for the request was because Appellant was now a convicted murderer. The trial court concluded that the stun belt should be used and stated the following:

[H]e's been convicted of first degree murder. There's no question that he's been convicted, and a jury has found him guilty of that offense beyond a reasonable doubt.

-29-

And so while [Appellant's attorney], in a sense you're correct, he's the same person; his status is different. His status is entirely different. And that in turn creates an entirely new equation, in my opinion.

. . . .

It's also a situation, as the first officer was candid to say, where none of us knows what the future's going to bring. I mean, none of us do. We don't know. And so the – the sheriff's office and – has the – I think the right to make sure with – in – in a limited way, to make sure that there aren't any problems. And that, I think is what they're trying to provide for in a – in a trial.

. . . .

In this case [Appellant] will come in and he won't be wearing a uniform. As I understand it, the – he'll be wearing – like he came in the last time, just dressed in normal street clothes. And that the device will not be visible. The jury won't see it. . . .

And – and so, looking at all those – all those factors, it seems to me that – that the use of – of the belt will not so distract from [Appellant] receiving a fair trial. And I don't think it will prevent him from being able to confer with his attorney and to be – during the – during the trial, and to be an active participant in that trial.

At the motion for new trial, and on appeal, Appellant argues that the stun belt interfered with his ability to participate in his trial. He did not present any evidence to support this allegation. At the conclusion of the hearing on the motion for new trial, the trial court stated that throughout the trial Appellant interacted freely with his counsel and that the trial court did not notice any interference with Appellant's participation.

In the case at hand, the trial court held a hearing, as our supreme court stated is the preferred method for making the decision as to whether a defendant should be required to wear a stun belt. In addition, the trial court made particularized findings. The trial court found a necessity for the use of the stun belt because of the violent nature of Appellant's previous convictions. We agree with the findings of the trial court that the State has proven the need for the use of the stun belt. It is clear that Appellant was on trial for a very violent crime, the murder of two people by beating them with a baseball bat. In addition, he had recently been convicted of another violent murder. Also, Appellant was in a desperate

situation because he was facing the potential of two additional life sentences when he already had a sentence of life plus forty years.

Furthermore, Appellant has failed to present any evidence either that the jury saw or knew of the stun belt or that the stun belt interfered with his participation in the trial. The trial court specifically found that Appellant actively participated in his trial. Therefore, he has not shown prejudice.

We conclude that the trial court did not abuse its discretion in ordering the use of a stun belt during Appellant's trial.

## Sufficiency of the Evidence

### Judgment of Acquittal

Appellant made a motion for judgment of acquittal at the conclusion of the State's proof. According to Tennessee Rule of Criminal Procedure 29(b):

> On defendant's motion or its own initiative, the court shall order the entry of judgment of acquittal of one or more offenses charged in the indictment, presentment, or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

This Court has noted that "[i]n dealing with a motion for judgment of acquittal, unlike a motion for a new trial, the trial judge is concerned only with the legal sufficiency of the evidence and not with the weight of the evidence." *State v. Hall*, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983). The standard for reviewing the denial or grant of a motion for judgment of acquittal is analogous to the standard employed when reviewing the sufficiency of the convicting evidence after a conviction has been imposed. *State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); *State v. Adams*, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995).

The law of this state is that the defendant waives any error by a trial court in denying a motion for a judgment of acquittal at the conclusion of the State's proof if the defendant goes on to introduce evidence following the denial of his motion. *Finch v. State*, 226 S.W.3d 307, 316-18 (Tenn. 2007); *Mathis v. State*, 590 S.W.2d 449, 453 (Tenn. 1979). At the conclusion of the State's proof, Appellant made a motion for judgment of acquittal. After hearing Appellant's argument, the trial court denied the motion. Appellant proceeded to

present witnesses and evidence. For this reason, Appellant has waived this issue with regard to the denial of his motion for judgment of acquittal at the conclusion of the State's proof.

As stated above, the standard for reviewing a judgment of acquittal is the same as that for sufficiency of the evidence. Below we address Appellant's claims that the trial court erred in not granting his motion for judgment of acquittal at the close of his proof and that the evidence was insufficient to support his convictions.

<u>Sufficiency of the Evidence</u>

Appellant makes several arguments with regard to the sufficiency of the evidence. He argues: (1) "the State's and Appellant's fact witnesses are substantially in conflict with each other"; (2) Appellant's statement does not stand up to the reasonable doubt standard and "[i]f [Appellant's] statement was suppressed because it was illegally obtained through coercive activity of law enforcement only inconclusive evidence is left"; (3) Dr. Stanley's statement about Appellant's mental state should not have been excluded because "any weight attributable to the [officer's] crafted statement, even if admitted into evidence, would have been diminished"; (4) there was insufficient proof of premeditation; and (5) there is a lack of physical evidence.

We will not address his arguments with regard to the denial of the suppression of his statement and the exclusion of Dr. Stanley's testimony. These arguments are merely a rearguing of the denial of the motion to suppress his statement and the exclusion of Dr. Stanley's testimony, the merits of which we have already addressed above.

To begin our analysis, we note that when a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally deemed with a presumption of innocence, the verdict of guilty removes this presumption and replaces it with one of guilt. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Bland*, 958 S.W.3d at 659; *Tuggle*, 639 S.W.2d at 914.

The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979).

In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

## Fact Witnesses

The guilt of a defendant, including any fact required to be proved, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). As such, all reasonable inferences from evidence are to be drawn in favor of the State. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *see Tuggle*, 639 S.W.2d at 914.

## Premeditation

Appellant argues that the "fact witnesses are substantially in conflict with each other." As stated above, questions concerning the credibility of witnesses and the weight of the evidence is determined by the trier of fact, in this case, the jury. *Pruett*, 788 S.W.2d at 561. It is clear from the verdict that the jury found the State's witnesses to be more credible. We may not substitute our judgment for that of the jury. Therefore, this issue is without merit.

Appellant also argues that the evidence was not sufficient to prove premeditation. First degree murder is described as "[a] premeditated and intentional killing of another; . . . ." T.C.A. § 39-13-202(a). Tennessee Code Annotated section 39-13-202(d) provides that:

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused

at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

An intentional act requires that the person have the desire to engage in the conduct or cause the result. T.C.A. § 39-11-106(a)(18). Whether the evidence was sufficient depends entirely on whether the State was able to establish beyond a reasonable doubt the element of premeditation. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). Whether premeditation is present is a question of fact for the jury, and it may be inferred from the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *see also State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998).

Premeditation may be proved by circumstantial evidence. *See, e .g., State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992). Our supreme court has identified a number of circumstances from which the jury may infer premeditation: (1) the use of a deadly weapon upon an unarmed victim; (2) the particular cruelty of the killing; (3) the defendant's threats or declarations of intent to kill; (4) the defendant's procurement of a weapon; (5) any preparations to conceal the crime undertaken before the crime is committed; (6) destruction or secretion of evidence of the killing; and (7) a defendant's calmness immediately after the killing. *See Pike*, 978 S.W.2d at 914-15; *Bland*, 958 S.W.2d at 660. This list, however, is not exhaustive and serves only to demonstrate that premeditation may be established by any evidence from which the jury may infer that the killing was done "after the exercise of reflection and judgment." T.C.A. § 39-13-202(d); *see Pike*, 978 S.W.2d at 914-15; *Bland*, 958 S.W.2d at 660.

One learned treatise states that premeditation may be inferred from events that occur before and at the time of the killing:

Three categories of evidence are important for [the] purpose [of inferring premeditation]: (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, planning activity; (2) facts about the defendant's prior relationship and conduct with the victim from which motive may be inferred; and (3) facts about the nature of the killing from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

-34-

2 Wayne R. LaFave, Substantive Criminal Law § 14.7(a) (2d ed. 2003).

The evidence presented at trial of the circumstances surrounding the murder meets the proof required to demonstrate premeditation. The evidence showed that Appellant had a previous acquaintance with the victim, Mr. Thacker, because Appellant purchased illegal drugs from him. The baseball bat was used as a deadly weapon, and there was no evidence that either victim was armed. Appellant attempted to dispose of the baseball bat and his clothes on the night of the murder. He was calm enough after the killings to steal the drugs in the victims' home and take them to his brother's house. Appellant proceeded to use the drugs with his brother and his brother's girlfriend. Appellant also told his mother that she did not want to know what he had done.

Appellant argues that the fact that the baseball bat used as a murder weapon was in the victims' home precludes forethought on his part. However, premeditation does not require "that the purpose to kill pre-exist in the mind of the accused for any definite period of time." T.C.A. § 39-13-202(a). We conclude that a reasonable trier of fact, in this case the jury, could conclude that premeditation was present from the circumstances presented at trial. Therefore, Appellant is not entitled to relief on this issue.

## Physical Evidence

Appellant also argues that there was no physical evidence to support the verdict with regard to first degree murder, felony murder, and especially aggravated robbery. In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Dorantes*, 331 S.W.3d at 379 (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

First degree murder is described as "[a] premeditated and intentional killing of another; . . . ." T.C.A. § 39-13-202(a). First degree felony murder is the "killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy . . . ." T.C.A. § 39-13-202(a)(2). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. T.C.A. § 39-11-302(b). Especially aggravated robbery is "the intentional

or knowing theft of property from the person of another by violence or putting the person in fear" where the culprit uses a deadly weapon and causes serious bodily injury to the victim. T.C.A. § § 39-13-401(a), -403(a).

As stated above, circumstantial evidence can support a conviction without any physical evidence. When the evidence is taken in a light which favors the State, we conclude that a reasonable trier of fact could find Appellant guilty of all elements of all three crimes. Appellant knew the victim, Mr. Thrasher, because Mr. Thrasher was his drug dealer. Ms. Walton was known to live with Mr. Thrasher as testified to by a police officer and another witness. According to Appellant's brother, Henry, Appellant suddenly appeared at his house late one evening with a duffel bag full of drugs. After Appellant, Henry, and Henry's girlfriend used the drugs, Appellant and Henry drove out near the river. Appellant stopped the truck, got something from under the hood of the truck, and threw it into the river. Henry also stated the Appellant told him to throw a pair of boots out of the window. A few weeks later, a fisherman found a baseball bat in the river. The baseball bat matched one seen in the victim's home by an officer. Officers also found clothes in the woods as well as a pair of boots. Appellant also told Henry that "Glen" deserved it and he did not know if Glen was still alive. Clearly, the jury found the State's witnesses to be credible. Credibility of the witnesses is a determination to be made by the jury. *Pruett*, 788 S.W.2d at 561. Furthermore, the evidence presented by the State matched the statement given by Appellant to the officers during his interview. As stated above, we cannot substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence."

Therefore, this issue is without merit.

## Evidentiary Issues

Appellant also argues that the following evidentiary issues were incorrectly determined by the trial court and, therefore, he was denied the right to a fair trial: (1) limitations put on the testimony of Scott Fields; (2) discrediting the testimony of Greg Fields by repeated instructions given by the trial court; (3) the prosecution's argument during closing argument that expert testimony had been stipulated to; (4) the refusal to allow both defense attorneys to present a final argument; (5) the denial of funds to pay for an expert witness; and (6) failure to assure that Appellant received his prescribed medications.

### Testimony of Scott Fields

Appellant argues that the trial court limited the testimony of Scott Fields by not allowing him to testify in rebuttal to the testimony of Ms. Burke because it would open the door to a discussion of the Ballis Tourist Home murder trial.

The Tennessee Rules of Evidence embody, and our courts traditionally have acknowledged, "a policy of liberality in the admission of evidence in both civil and criminal cases . . . ." *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978); *see also State v. Robinson*, 930 S.W.2d 78, 84 (Tenn. Crim. App. 1995). To be admissible, evidence must satisfy the threshold determination of relevancy mandated by Rule 401 of the Tennessee Rules of Evidence. *See, e.g., Banks*, 564 S.W.2d at 949. Rule 401 defines "relevant evidence" as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Tenn. R. Evid. 403; *see also Banks*, 564 S.W.2d at 951. In order to be admissible, evidence must be relevant and probative to an issue at trial. *State v. McCary*, 922 S.W.2d 511, 515 (Tenn. 1996); *see also* Tenn. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence may be excluded at trial if the probative value of that evidence "is substantially outweighed . . . by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. The determination of relevancy is left to the discretion of the trial court, and this Court will not overturn a trial court's determination in this regard in the absence of an abuse of discretion. *State v. Forbes*, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995).

At trial, Appellant made an offer of proof for Scott Fields to testify as a witness to impeach the testimony of Ms. Burke and Henry. Appellant wanted to ask Scott about a statement Ms. Burke made in which she told Scott that she knew that Henry did not commit the murders. The trial court held a jury-out hearing. The State argued that the statement in question was actually made in reference to the Ballis Tourist Home Murder trial. The trial court ruled that Appellant could ask Scott about Ms. Burke's statement, but the State would be allowed to recall Ms. Burke to testify about the statement. Appellant's counsel stated, "if your Honor is going to rule in their favor on that issue we're not going to call Scott Fields . . . ." The trial court stated the following:

> I'm holding that it would – I mean the jury has to have a context and while it's highly prejudicial, I mean it just – and you're trying to go to the heart of the credibility of the mother and so I just think it's highly probative and any – the probative value of her being allowed to say the context of the statement, he knew he didn't do it.

Initially, we point out that the trial court did not limit the testimony of Scott. Instead, the trial court informed Appellant that he was free to call Scott to testify to the statement attributed to Ms. Burke, but the trial court was going to allow the State to recall Ms. Burke in rebuttal to give the statement context. It was Appellant's choice to not call Scott to testify about the statement in question.

Any competent evidence which explains or directly applies to evidence introduced by the accused is admissible in rebuttal. *State v. Thompson*, 43 S.W.3d 516, 524 (Tenn. Crim. App. 2000). "The [S]tate is given the right of rebuttal because it 'does not and cannot know what evidence the defense will use until it is presented at trial.'" *Id.* (quoting *State v. Cyrus Deville Wilson*, No. 01C01-9408-CR-00266, 1995 WL 676398, at *9 (Tenn. Crim. App., at Nashville, Nov. 15, 1995)). The admission of rebuttal evidence, as well as the scope of such evidence, is within the sound discretion of the trial judge. *State v. Reid*, 213 S.W.3d 792, 831 (Tenn. 2006).

We agree with the trial court. Appellant's offer of the statement attributed to Ms. Burke, while highly probative, is also very prejudicial and requires explanation from Ms. Burke. Therefore, we conclude that the trial court did not abuse its discretion in ruling that the State would be allowed to recall Ms. Burke to testify in rebuttal if Appellant chose to present Scott to testify to the statement in question.

Testimony of Greg Fields

Appellant also argues that the trial court erred when it repeatedly instructed the jury during Greg Fields's testimony that the jury could only consider Greg's testimony for impeachment purposes.

During the trial, Greg Fields, the brother of Appellant and Henry Fields, testified. His testimony was presented in an attempt to contradict the testimony of Ms. Burke and Henry. During his testimony, the trial court stated the following:

> [Appellant's counsel], let me make sure I explain something to the jury. Now, a witness may be impeached by proving that a witness has made some material statement out of court that's at variance with his or her testimony on the witness stand. However, proof of that prior inconsistent statement may be considered by you only for the purpose of testing that witness' credibility. It's not substantive evidence of the truth of what's contained in such statement and so the jury, when a witness is impeached the jury has the right to disregard his or her evidence . . . .

-38-

Appellant did not object to this statement by the trial court. The trial court made a similar statement to the jury one other time during Greg's testimony. Appellant now argues that these two instructions were interruptive and discrediting. Appellant did not object to either instruction by the trial court. Appellant's failure to object to the instructions by the trial court constitutes waiver of this issue on appeal. *See* Tenn. R. App. P. 3(e) and Tenn. R. App. P. 36(a) (stating "nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Furthermore, Appellant has not proven that the trial court's instructions were "interruptive or discrediting." This is especially true because these instructions are a correct statement of the law. *See* Tenn. R. Evid. 613(b).

The State's Closing Argument

Appellant argues that he was denied a fair trial because the State misled the jury during closing argument when it "mistakenly argued the State's expert testimony had been stipulated when it was only the experts' qualifications that were stipulated . . . ."

At trial, counsel for the State made the following statement:

> [Appellant's] counsel talks about the State's experts. Well, who stipulated to those experts? They didn't want you to hear all *how qualified they were*. Who stipulated to them? They stipulated that they were experts and they're not our experts. They're called to tell the way they see it. They don't slant it. . . . All the evidence is they're experts that they stipulated to that told it the way they saw it based on their expertise.

(emphasis added).

Appellant objected at this time. There was a short bench conference during which Appellant argued that he did not stipulate as to the experts' testimony, but to the fact that the experts were qualified as experts. Counsel for the State argued that he had said that they stipulated as to the experts' qualifications. The State continued with its argument and stated, "Well, I would say they stipulated that they were experts and you heard their expertise."

It appears to this Court that, although inartfully phrased, the statement in question maintains that Appellant stipulated to the qualifications of the experts. The statement

-39-

includes the following, "who stipulated to those experts? They didn't want you to hear all how qualified they were." Clearly, this was a reference to the qualifications. Therefore, we conclude that this statement in the State's argument was not misleading and, therefore, not improper.

### Failure to Include Supporting Argument, Make Appropriate References to the Record, and Cite to Authorities

Tennessee Rule of Appellate Procedure 27(a)(7) provides that a brief shall contain "[an] argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on." Tennessee Court of Criminal Appeals Rule 10(b) states that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." *See also State v. Sanders*, 842 S.W.2d 257 (Tenn. Crim. App. 1992) (determining that issue was waived where defendant cited no authority to support his complaint). Therefore, the following issues are waived for the following reasons.

1. Denial of Request for Both Defense Attorneys to Present Final Argument

Appellant also argues that he was denied the right to counsel because the trial court refused to let both of his defense attorneys present a closing argument. The trial court denied Appellant's request that both of his attorneys be allowed to present a closing argument. One of Appellant's attorneys was allowed to present an argument. Appellant has cited to the general law regarding the right to counsel presented in the United States and Tennessee Constitutions. However, he has presented no argument as to how his right to counsel was violated by only one attorney presenting an argument as opposed to two attorneys presenting arguments. In addition, he does not cite to any law to support his argument that closing arguments from two attorneys was necessary to afford him counsel under the Sixth Amendment. This issue is waived for failure to present argument and to cite to authority.

2. Denial of Funds to Pay for Expert Witness

Appellant argues that the trial court violated his right to a fair trial because it limited Appellant's expenditures for an expert witness in the field of false confessions to $2,500.00. At the hearing on the motion for new trial, the trial court held the following:

[N]ow if I recall didn't we have a hearing on that, [Appellant's counsel].

. . . .

And the question was not so much with regard to the money. I mean your motion seems to say that here was only up to $2500.00 but one of the things that we talked about was the fact that if you're dealing with an issue of false confessions when the defendant gave three different versions . . . . I mean how can you have an expert come in and say, well, the third one is false, or the first one is false or the second one is false, without the defendant – or maybe all three. I don't know. So for those reasons that are previously stated and I don't think it was a monetary issue, I just think it was an evidentiary issue.

This issue is waived for failure to make appropriate references to the record.

### 3. Failure to Assure that Appellant Received Prescription Medication

Appellant also argues that he was denied his right to a fair trial because the trial court denied his "request for medication to treat his medical health disorders." At trial, the trial court held a hearing regarding whether Appellant was going to testify. Appellant testified that the main reason he did not want to testify on his own behalf is that he was "not on [his] nerve medication and it's for my nerves and I just don't think I can go through with it." The trial court determined that Appellant had knowingly and intelligently waived his right to testify. In his brief, Appellant states that he "was denied the right to freely and voluntarily make a knowing and intelligent waiver of his right to testify on his own behalf." However, Appellant has failed to cite to any authority regarding a defendant's waiver of his right to testify. Therefore, it is waived.

### Cumulative Error

Appellant also argues that these errors are cumulative errors by the trial court and justify a reversal of his convictions. Because we have found no reversible error in the issues raised by Appellant, we decline to determine that cumulative errors by the trial court require a reversal of Appellant's convictions. This issue is without merit.

### **Sentencing**

At the conclusion of the jury trial, the jury found Appellant guilty of two counts each of first degree premeditated murder and first degree felony murder. The jury subsequently determined that Appellant's sentences for those convictions should be life without parole. The trial court held a separate hearing to determine the sentences to be imposed for the

-41-

convictions for especially aggravated robbery. Initially the trial court merged the first degree premeditated murder convictions into the convictions for felony murder. The trial court sentenced Appellant to twenty-five years as a Range I standard offender, with a violent offender 100% release eligibility, for each especially aggravated robbery conviction. One twenty-five-year sentence was ordered to run concurrently with first felony murder life sentence and the second twenty-five-year sentence was ordered to run concurrently with the second felony murder life sentence. The trial court ordered that the two life sentences be served consecutively to each other and consecutive to a previously imposed sentence of life plus forty years.

Length of Sentence

Appellant argues that the trial court erred in applying enhancement factors that are elements of the crimes for which he was convicted.

Appellate review of sentencing is for abuse of discretion. We must apply "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, first determines the range of sentence and then determines the specific sentence and the appropriate combination of sentencing alternatives by considering: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts regarding sentences for similar offenses; (7) any statements the defendant wishes to make in the defendant's behalf about sentencing; and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-210(a), (b), -103(5); *State v. Williams*, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

The trial court is still required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. *See Bise*, 380 S.W.3d at 706, n. 41; *State v. Samuels*, 44 S.W.3d 489, 492 (Tenn. 2001). Thus, under *Bise*, a "sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 710.

As stated above, Appellant's challenge to the application of the enhancing factor is that it is an element of the offense. The trial court applied one enhancement factor, that the Appellant had a previous history of criminal convictions or behavior. T.C.A. § 40-35-114(1). Clearly, this is not an element of especially aggravated robbery. Therefore, this issue is without merit.

Especially aggravated robbery is a Class A felony. T.C.A. § 39-13-403(b). The range of sentence for a Class A felony at Range I is fifteen to twenty-five years. T.C.A. § 40-35-112(a)(1). The trial court applied one enhancement factor, and one mitigating factor, that the Appellant confessed. However, the trial court gave the mitigating factor scant weight and stated that the previous criminal history and behavior far outweighed the mitigating factor. The trial court set out all the factors required under *Bise*. It is within the appropriate range and is in compliance with the sentencing structure. Therefore, the imposition of the twenty-five-year sentences for especially aggravated robbery are appropriate.

### Consecutive Sentencing

Appellant also argues that the trial court erred in imposing consecutive sentencing. The State disagrees. With regard to consecutive sentencing, Appellant argues that the factors relied upon by the trial court to impose consecutive sentencing are inherent elements of the crimes of which he was convicted.

Under Tennessee Code Annotated section 40-35-115(a), if a defendant is convicted of more than one offense, the trial court shall order the sentences to run either consecutively or concurrently. A trial court may impose consecutive sentencing upon a determination that one or more of the criteria set forth in Tennessee Code Annotated section 40-35-115(b) exists. This section permits the trial court to impose consecutive sentences if the court finds, among other criteria, that:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a

pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

T.C.A. § 40-35-115(b).  When imposing a consecutive sentence, a trial court should also consider general sentencing principles, which include whether or not the length of a sentence is justly deserved in relation to the seriousness of the offense.  *See State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002).  The imposition of consecutive sentencing is in the discretion of the trial court.  *See State v. Adams*, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997).

The trial court considered the factors enumerated in Tennessee Code Annotated section 40-35-115(b) and concluded that Appellant's sentence should run consecutively to the sentence he was already serving because Appellant had an extensive record of criminal activity and he was a dangerous offender.  T.C.A. § 40-35-115(b)(2), (4).  The record reflects that in its analysis, the trial court specifically considered the factors in the sentencing statute and concluded that Appellant's criminal history is extensive.  The trial court pointed out that Appellant had previous convictions for "aggravated assault, aggravated burglary, theft, another aggravated burglary, felony conviction all occurred in the [1990s], . . . he had a DUI in 2001. . . . he has also been convicted in S52,741, [of] reckless homicide, the felony first-degree murder, two counts of especially aggravated burglary, especially aggravated robbery."  Therefore, we conclude that Appellant's criminal history is sufficiently extensive to support the imposition of consecutive sentences pursuant to Tennessee Code Annotated section 40-35-115(b)(2).

The trial court also based the imposition of consecutive sentencing on the finding that "the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high."  T.C.A. § 40-35-0115(b)(4).  Before ordering the defendant to serve consecutive sentences on the basis that he is a dangerous offender, the trial court must find that the resulting sentence is reasonably related to the severity of the crimes, necessary to protect the public against further criminal conduct, and in accord with the general sentencing principles.  *See Imfeld*, 70 S.W.3d at 708-09; *State v. Wilkerson*, 905 S.W.2d 933, 938-39 (Tenn. 1995).  The trial court made these findings with regard to the imposition of consecutive sentences.

Therefore, we conclude that there was no error in the imposition of Appellant's sentences.

## CONCLUSION

For the foregoing reasons, we affirm the judgments of the trial court.


_____
JERRY L. SMITH, JUDGE